[849 NYS2d 530]

In the Matter of DANIEL CAPELLAN, Petitioner, v LEWIS BART STONE et al., Respondents.

In the Matter of JULIO SANTOS, Petitioner, v LEWIS BART STONE et al., Respondents.

First Department, January 15, 2008

### APPEARANCES OF COUNSEL

*Mark Jankowitz*, New York City, for Daniel Capellan, petitioner.

*Steven Banks, The Legal Aid Society*, New York City (*Justine Luongo* and *Michelle Fox* of counsel), for Julio Santos, petitioner.

*Robert M. Morgenthau, District Attorney*, New York City (*Olivia Sohmer* and *Michael S. Morgan* of counsel), respondent pro se.

### OPINION OF THE COURT

MARLOW, J.

Petitioners Julio Santos and Daniel Capellan were each indicted on a single count of criminal sale of a controlled substance in the third degree. On or about February 1, 2007,[1] a jury trial commenced in Supreme Court, New York County. During the trial, one juror was replaced by an alternate. On Tuesday, February 6, 2007, both sides rested, the court charged the jury, the remaining alternate was dismissed, and the jury began deliberating. When the jurors ended the day without reaching a verdict, the court excused them for the evening, directing them to return the next morning. However, on Wednesday, February 7, juror No. 10 called and advised the court he was ill and unable to appear. Both petitioners waived the statutory continuous deliberations requirement of CPL 310.10 and the concomitant right to appeal, and the court adjourned the case to Thursday, February 8, 2007.

Thursday morning, the court advised all parties that a friend of juror No. 10 had called to say the juror was still ill. The court elicited petitioners' agreement to adjourn deliberations another day. The judge then called the juror's friend who was unable to provide any further information about the juror's future avail-

---

**1.** It is unclear from the record whether the trial commenced on January 31 or February 1, 2007.

ability. Thereafter, the judge attempted to contact the juror directly by calling his cell and home phones. The cell phone did not work, and a message was left on the home phone. The court waited an hour for the juror to return its call.

The juror did not call back, and the court announced that since it could not ascertain whether the juror would return it was prepared to declare a mistrial. Both petitioners objected, and the court dispatched court officers to the juror's apartment. They arrived at about 12:10 P.M. and spoke with the doorman, who called the juror's apartment. Receiving no answer, the officers went upstairs, knocked on the door and called out to him. After five minutes, the officers departed, leaving a message with the doorman for the juror to contact the court.

At about 12:30 P.M., the juror called the court, claiming that he had been in the bathroom and did not hear the officers at his door. The juror told the court it was "highly unlikely" he would be in court the next day, Friday, February 9. The following Monday was Lincoln's Birthday, a state holiday, and the juror indicated he "ought to be available" on Tuesday, February 13.

Both defense lawyers and the prosecutor were willing to adjourn the case over the holiday weekend, until Tuesday. However, the court would agree only if the parties waived their right to continuous deliberations and their right to appeal.

Everyone consented.

Notwithstanding this unanimous consent, the court announced its intention to declare a mistrial if, after questioning the other jurors, they were not all able to return on Tuesday.

The court then questioned the other jurors about their availability the following week. Juror No. 4 responded "I don't really know because I work freelance." The court explained that the juror would have the rest of that Thursday afternoon and all the next day, Friday, to return to work. Juror No. 4 added that jury duty was "becoming a financial burden." Juror No. 5 had to check his schedule, explaining that "I have to check, because I have some deals at work that I've kind of given to other folks that may or may not be able to handle." Juror No. 6 was available Tuesday, Thursday and Friday, but not Wednesday.

At this point, the court asked counsel whether they would consent to another day if deliberations went past Tuesday. Both defense counsel again agreed.

The court resumed questioning the jurors. Juror No. 7 was not available Friday, February 16. Another juror, otherwise

unidentified in the record, was not available that Friday afternoon.

The court stated that "if everyone can come in, we'll come in on Tuesday and hopefully [juror No. 10] won't be in the hospital. If he is, we'll address that at that time." One of the jurors then informed the court "I need to be back at work" on Tuesday.[2] The court then conducted the following inquiry:

"THE COURT: Put on the record what your work is.

"THE JUROR: What I do for a living?

"THE COURT: Yes.

"THE JUROR: I work for JP Morgan, finance. I'm sorry."

The court then expressed its concern that it had earlier represented to the jury that the trial would not extend into the next week. After conferring with counsel, the court stated:

"At this point, having talked to juror number ten and he giving me no unequivocal basis that he would be back on Tuesday, and indicating that he had no idea whether he would or not, and not being a physician to be able to ascertain whether his problem was flu or otherwise, and he's already been out for two days—the best that we can ascertain he's quite ill—I can't in good conscience keep this jury any further.

"So I'm going to declare a mistrial. And I will do so recognizing that that is over the objection of the defense."

Counsel placed their specific objections on the record. In particular, Santos's attorney argued that the mistrial was not based on manifest necessity because of work issues as the jurors had described them. Counsel observed that all the jurors indicated that this would be a financial hardship but argued that, as jurors, they had to allow time to deliberate. Capellan's attorney believed the juror No. 10's explanation that he was sick was "highly suspect" and suggested that he be required to come in. The court refused to entertain that suggestion.

Subsequently, petitioners moved to dismiss the indictment and bar retrial on the ground that their rights under the double

---

**2.** Although this juror is not otherwise identified in the record, it seems likely, based on the overall colloquy, that this was juror No. 5 reporting back on his availability for Tuesday.

jeopardy clauses of the United States and New York Constitutions and the Criminal Procedure Law had been violated. The court denied the motion because (1) there was manifest necessity to declare the mistrial and (2) petitioners could not waive the continuous deliberations mandate of CPL 310.10.

Petitioners each now seek a writ of prohibition pursuant to CPLR article 78 against Justice Lewis Bart Stone, the trial justice, Justice Micki Scherer, Administrative Judge of the Criminal Term, Supreme Court, New York County, and Robert Morgenthau, District Attorney, New York County, barring retrial. Justices Stone and Scherer have elected not to appear; the District Attorney opposes the writs.

Conceding the court erred in ruling that the statutory requirement of continuous deliberations could not be waived, the District Attorney nevertheless argues that rejection of petitioners' respective waivers was warranted as a matter of discretion given the length of the recess in deliberations necessitated by juror No. 10's absence. The District Attorney also argues that there was a manifest necessity to declare a mistrial given the circumstances surrounding juror No. 10's unavailability.

One of the reasons the trial court denied petitioners' motions seeking to bar a retrial was its mistaken belief that petitioners could not waive the continuous deliberations mandate of CPL 310.10. In 2001, the Legislature amended CPL 310.10 (2), the criminal statute dealing with jury deliberations, to give trial judges discretion to sequester jurors for all trials, regardless of the severity of the crime. The trial court observed that the statute, as amended, specifically did not provide for a waiver of continuous deliberations, and, finding the question to be one of first impression, concluded that, notwithstanding both defense counsels' and the prosecutor's agreement to adjourn deliberations until after the holiday weekend, such a delay was nonetheless impermissible.

The court's conclusion that the statute precludes a waiver of continuous deliberations is contrary to the decisional law interpreting both the predecessor statute of CPL 310.10 and the statute as presently enacted (see People v Bello, 82 NY2d 862, 863 [1993], citing People v Webb, 78 NY2d 335 [1991]; People v Garcia, 24 AD3d 308 [2005], lv denied 6 NY3d 833 [2006]). Moreover, the court may declare deliberations to be in recess for certain prescribed time periods (see CPL 310.10 [2]).

Since the parties were free to waive the statutory requirement of continuous deliberations, the critical and dispositive

question is whether the trial court improvidently exercised its discretion by ordering a mistrial because of juror No. 10's uncertain health.

It is beyond cavil that once a jury has been selected and sworn, jeopardy attaches (*see Illinois v Somerville*, 410 US 458, 467 [1973]). The court must declare a mistrial and order a new trial "[u]pon motion of either party or upon the court's own motion, when it is physically impossible to proceed with the trial in conformity with law" (CPL 280.10 [3]). However, if a court grants a mistrial over a defendant's objection, the principle of double jeopardy will generally bar the People from retrying a defendant unless the court's declaration "was required by 'manifest necessity' or the 'ends of public justice' " (*Illinois v Somerville* at 468, explaining *United States v Perez*, 9 Wheat [22 US] 579 [1824]; *see also People v Michael*, 48 NY2d 1, 9 [1979]; *Matter of Colcloughley v Johnson*, 115 AD2d 58 [1986], *lv denied* 68 NY2d 604 [1986]). The People bear a "heavy" burden to demonstrate that the mistrial was manifestly necessary (*see Arizona v Washington*, 434 US 497, 505 [1978]; *Matter of Dickson v Morgenthau*, 102 AD2d 168, 171 [1984]). Further, before a court orders a mistrial, it must explore "appropriate alternatives" and provide a sufficient basis in the record for resorting to this drastic measure (*Hall v Potoker*, 49 NY2d 501, 505 [1980]).

While a trial court is entrusted with discretion to determine whether a manifest necessity exists to support the declaration of a mistrial, such discretion is not limitless. Indeed, as the Court of Appeals observed in *Matter of Enright v Siedlecki* (59 NY2d 195, 200 [1983]):

> "The reasons underlying the grant of a mistrial may not be illusory; rather, in order fully to protect the defendant's right to trial by a particular tribunal they must be necessitous, actual and substantial. Thus, if the Judge acts so abruptly as not to permit consideration of the alternatives or otherwise acts irrationally or irresponsibly or solely for convenience of the court and jury or other similar abuse of discretion, retrial will be barred" (citations omitted).

Applying these settled legal principles to this record, we can find in it no manifest necessity to declare a mistrial. Rather, the court aborted the trial without making an adequate record to support its abrupt decision to do so and failed also to explore

and consider other alternatives. Based on the manner juror No. 10 notified the court of his absence and his failure to respond to the judge's phone messages and to the court officers' knocking on his door, there was some speculation expressed that the juror was feigning illness. Since, after its phone conversation with juror No. 10, the court believed itself unable to discern the juror's actual state of health, it could and should have—as indeed defense counsel requested—summoned him to court to explain his absence,[3] or, at a minimum, directed the juror to speak in person with the court officers whom the court could have once again immediately dispatched to the juror's home. Had the juror appeared ill to the officers, the court could have required, instead of his presence, medical proof of his illness and a medical opinion forecasting his recovery period. Such proof and opinion could, under these circumstances, have been furnished to the court and the parties by fax or phone. At that point, the court likely would have had a reasonable basis to draw a reliable conclusion about the juror's ability to proceed. Had the evidence shown that the juror was not in fact ill, the court could have inquired further into the reason for his reluctance to continue deliberations in order to determine whether he could continue to deliberate with the other jurors in a fair and impartial manner (*see e.g. Matter of Robles v Bamberger,* 219 AD2d 243, 246-247 [1996], *appeal dismissed* 88 NY2d 962 [1996], *lv denied* 88 NY2d 809 [1996]).

The record does not at all establish that the condition of juror No. 10's health rendered him unable to proceed with his duties as a juror or presented an actual danger to his health were he required to do so (*compare People v Ramchair,* 308 AD2d 601 [2003], *lv denied* 1 NY3d 578 [2003] [mistrial proper where one day after jury sequestered, juror admitted to hospital for indefinite period of time and diagnosed with possible heart attack]; *Matter of Kleigman v Justices of Supreme Ct., Kings County,* 285 AD2d 646, 647 [2001] [mistrial appropriate where after jury sequestered, juror suffered seizure; doctor advised court that regardless of test results, juror was "very sick," would be hospitalized for at least three days, would require one to two weeks of bed rest, and it would be unwise to continue with stressful situation of jury deliberations]).

Notwithstanding juror No. 10's anticipated third absence on Friday, February 9, all parties again agreed, and indeed ap-

---

**3.** Indeed, it is puzzling why the court so adamantly refused this reasonable avenue of inquiry.

peared anxious, to adjourn deliberations until Tuesday, February 13, after the three-day weekend. The meager evidence used to support the court's precipitous decision to declare a mistrial—based merely on juror No. 5's representation that he worked at JP Morgan Bank and needed to return to work on Tuesday to attend to certain unspecified "deals"—falls far short of meeting the evidentiary standard for a finding of manifest necessity.

Initially, we find the inquiry of juror No. 5 inadequate. The court did not ascertain (1) the exact nature of the juror's business; (2) the number, nature and extent of the business "deals" to which he alluded; (3) whether the juror could have taken care of these responsibilities on Thursday afternoon or Friday (February 8 or February 9) or at any other time before February 13 during the court's upcoming three-day recess; (4) whether, perhaps, during this recess, the juror could have prepared a coworker to handle any pressing business; or (5) whether and for how long the "deals" could have awaited the end of deliberations. Notably, while juror No. 4 indicated that the prolonged deliberations were causing a financial hardship because she worked freelance, she did not refuse to continue jury service.

Even assuming juror No. 5 was the only person at a company like JP Morgan who would have been capable of handling these deals, the inadequacy of this record renders it impossible to decide whether it would have been more than a mere inconvenience to require juror No. 5 to continue deliberating after the holiday weekend. The law recognizes that some level of inconvenience and burden is unfortunately a necessary ingredient to preserve our criminal justice system. As the Court of Appeals stated:

> "[A] mistrial founded solely upon the convenience of the court and the jury is certainly not manifestly necessary. . . .

> "[A] citizen called to jury duty will often be required to make some personal sacrifices, financial or otherwise. This usually seems unjust to those so called upon, and in fact it sometimes is unjust, but it is necessary as long as we are to persist in our cherished belief that an accused felon is entitled to be tried by a jury of his peers" (*People v Michael*, 48 NY2d at 9-10; *see also Colcloughley*, 115 AD2d at 62 [nothing to prevent trial from continuing but work related inconvenience of two jurors and consequent displeasure of court]).

We observe that juror discontent which is so intense that it rises to a level of bias against a defendant, or otherwise endangers a just verdict (*e.g. Matter of Robles v Bamberger*, 219 AD2d 243 [1996], *supra*), is rare,

> "for a distinction must be drawn between the ordinary pique of a juror at being forced to postpone his or her normal pursuits, and that inability to fairly view the evidence which mandates a mistrial. Most jurors will remain faithful to their oath and put aside their personal grievances in the attempt to reach a fair verdict" (*Michael*, 48 NY2d at 10).

The court has discretion to ascertain whether a mistrial is warranted based on the degree of jury discontent or significant inconvenience established on the record. However, "[w]here, as here, the decision to declare a mistrial is based . . . on the fact that a delay in trial would inconvenience . . . the jury, and *without any inquiry into the effect of such a delay on the jur[or]'s ability to render a fair verdict, discretion falters and abuse appears*" (*id*. at 11 [emphasis added]). Moreover, we can find no indication in the record "that the court explored alternatives to the declaration of a mistrial as it was bound to do" (*Colclough-ley*, 115 AD2d at 61).[4]

The obvious and correct solution was to adjourn the case until Tuesday, as all parties had originally and throughout agreed, and summon juror No. 10 to appear in court or require him to furnish some reliable form of medical proof of his incapacity to continue deliberations. Then, if deliberations could not have resumed on Tuesday, a further record could have been made, one which, depending on the circumstances, may have justified a mistrial.

We take this opportunity to emphasize in the strongest possible terms the critical importance of making a thorough record in this as in many other circumstances, notwithstanding how difficult and stressful that may sometimes be, and even when crushing caseloads might tempt a court to do something less.

We believe in situations like this, a court must be deliberate and cautious, reasonable and thorough, and sensitive but firm, before it issues any ruling that would force a defendant—unnecessarily—to be tried twice for the same crime. The trial court

---

4. While some might consider deliberating, on consent, with fewer than 12 jurors an alternative, the law was not yet settled at this juncture to consider this a viable option (*see People v Gajadhar*, 38 AD3d 127 [2007], *affd* 9 NY3d 438 [2007]).

here was not only too lenient with both juror No. 10 and juror No. 5, but it also questioned them insufficiently. Consequently, both jurors said far too little to justify excusing either from their grave responsibility to honor their oath and continue their deliberations in good faith.

The court had a critically important and fundamental obligation to remind these jurors of their solemn civic duty to continue service, a service that must override convenience and quite often interrupt other obligations. Therefore, trial judges must make their best and most persuasive effort to awaken jurors to their indispensable role in the continued viability of our system of criminal justice, a skill we believe judges possess in abundance. To allow jurors to discontinue service so easily as occurred here does significant harm to our system by rendering it vulnerable to even greater abuse, where—as experience informs us—far too many people already seek to avoid jury service. Indeed, "[a] measure of inconvenience is something which must be countenanced for the jury system to continue" (*Colcloughley,* 115 AD2d at 62).

History, our values, and our firmly footed legal principles all demand that we do nothing less.

Accordingly, the separate petitions for a writ of prohibition should be granted, on the law and the facts, without costs, respondents prohibited from retrying petitioner Daniel Capellan on New York County indictment No. 3576/06, and respondents prohibited from retrying petitioner Julio Santos on New York County indictment No. 3576/06.

Lippman, P.J., Mazzarelli, Catterson and Kavanagh, JJ., concur.

Separate petitions for a writ of prohibition granted, on the law and the facts, without costs, and respondents prohibited from retrying petitioners Daniel Capellan and Julio Santos on the indictment.